IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAY FARRIS,

        **Plaintiff,**

vs.                                                                                                                                            No.  02cv1173 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

**MEMORANDUM OPINION AND ORDER**

        This matter is before the Court on Plaintiff's (Farris') Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 11]**, filed March 28, 2003, and fully briefed July 18, 2003.  The Commissioner of Social Security issued a final decision denying Farris' application for disability insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

**I.  Factual and Procedural Background**

        Farris, now fifty-four years old, filed his application for disability insurance benefits on January 31, 2001, alleging disability since October 17, 1999, due to degenerative lumbar and lumbosacral disc disease and diabetes mellitus.  Tr 26.  Farris has a high school education, vocational training as a heavy equipment operator, and past relevant work as a heavy equipment operator.  On April 26, 2002, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Farris' impairments were severe but did not singly or in combination meet or

equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1.  Tr. 14.  The ALJ specifically reviewed Listing 1.00 and 9.00.  Tr. 26.  The ALJ further found Farris retained the residual functional capacity (RFC) which supports light work.  *Id.*  As to his credibility, the ALJ found Farris' "testimony and reports of symptoms and functional restrictions were not supported by the evidence overall in the disabling degree alleged, and, therefore lacked credibility."  *Id.*   Farris filed a Request for Review of the decision by the Appeals Council and submitted new evidence, a Physical Work Performance evaluation administered by a licensed occupational therapist.  Tr. 6-16.  On September 23, 2002, the Appeals Council considered the additional evidence and decided it did not provide a basis for changing the ALJ's decision and denied review.  Tr.  4.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Farris seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Farris makes the following arguments: (1) the ALJ erred in finding he did not meet Listing 1.05;  (2) the ALJ incorrectly analyzed the medical expert's testimony; (3) the ALJ should have obtained the opinion of a consulting physician; and (4) the ALJ improperly found he was not credible.

**A.  Listing 1.05C**

Farris claims the ALJ's finding that he did not meet Listing 1.05 is not supported by the evidence.  Listing 1.05C pertains to disorders of the spine due to other vertebrogenic disorders such as herniated nucleus pulposus or spinal stenosis and provides as follows:

> C.     Other vertebrogenic disorders (e.g., herniated [disk], spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and    expected to last 12 months. With both 1 and 2:
>
> 1.     Pain, muscle spasm, and significant limitation of motion in the spine; and
> 2.     Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05C (1999)(emphasis added).[1]  The ALJ noted that she had "specifically reviewed sections 1.00 (Musculoskeletal system) and 9.00 (endocrine system)." Tr. 26.  The ALJ found:

> There is no evidence that the claimant has a back condition expected to cause legs symptoms.  His diagnostic testing establishes only a mild back condition, and his treating

---

[1] Listing 1.05C was revised in 2002, and it is now Listing 1.04.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2002).

4

>orthopedist did not diagnose radicular symptoms from his back condition. That physician only raised a question whether the claimant's leg symptoms were caused by diabetic neuropathy. The claimant was initially diagnosed as having diabetic lower extremity neuropathy which was causing pain and numbness, however, his diabetes was brought under control and there is no evidence that he has had persisting lower extremity neuropathy after the initial period after his diagnosis of diabetes. While the claimant testified that his doctor wants to 'wait' to do back surgery at a later date, the evidence reveals only that his doctor has stated that he has no back condition which would be improved by surgery.

Tr. 26 (citations to record omitted). The medical evidence does not support a finding that Farris meets Listing 1.05C.

### 1. Summary of Medical Evidence

An MRI dated October 26, 1999, showed a small lesion of L3 which the radiologist interpreted as "a hemangioma." Tr. 139. The MRI also showed a "<u>mild anterior herniation</u> and anterior protrusion of the disk at L5-S1 which <u>narrows</u> the neural canal, <u>mildly, but probably impinges the nerve root at S1-2 on the right</u>." *Id.* (emphasis added).

On December 10, 1999, Dr. Borra evaluated Farris at Dr. Cummings' request. Tr. 142-143. Farris complained of lower lumbar pain that "bilaterally extend[ed] over the hips and to the thighs." Tr. 142. However, Farris reported the pain was more on "the right thigh, anterolateral to the knee and sometimes extending below the knee." *Id.* At that time, Farris was receiving physical therapy three times a week for three hours each visit and going to the chiropractor once a week. Farris complained of having trouble bending over at the waist and constant pain. Dr. Borra's physical examination revealed (1) <u>mild spasm-like tone in his lower paraspinous muscles</u>; (2) palpation of the lumbar spine revealed no pain, paravertebral palpation revealed no inflamed facette joints; (3) twisting axially on his lumbar spine produced no apparent pain; (4) bending caused some difficulty; (5) <u>supine position leg raise was negative</u>; and (6) there was <u>no motor or</u>

gross sensory deprivation deficits. Tr. 143 (emphasis added).  The MRI indicated a "mild anterior herniation at L5-S1, some L5-S1 posterior protrusion, with possible impingement upon the right S1-S2 nerve foramina." *Id.* (emphasis added).  Dr. Borra assessed Farris with herniated nucleus pulposus L5-S1, anteriorly, with posterior protrusion, with radicular symptoms on the right.  Dr. Borra also noted radicular symptoms on the left and stated, "Whether his pain that he complains of [had] any significant correlation with the MRI findings is rather mixed." *Id.*  Dr. Borra thought some of the pain was secondary from compensatory posturing.  Dr. Borra recommended an LESI (lumbar epidural steroid injection) and administered one on that day. Tr. 143-147.

On January 27, 2000, Dr. Borra administered a second epidural steroid injection, noting:

> Mr. Farris is a 50-year-old white male who saw me on 12/10/99, for his initial problem with lumbar back pain and bilateral radicular symptoms.  At that time he had more pain that was focal in the lumbar region and bilateral upper thighs.  At the time the MRI had indicated that he had an L2-3, L4-5, L5-S1 disk desiccation with protrusion of the disk at L5-S1 into the spinal canal.  There was question of right L5-S1, S1-S2 foraminal obstruction that was consistent to some degree with his right buttocks pain and pain extending from the thigh into the calf.
>
> Today the patient tells me that his lower lumbar pain and thigh pain improved markedly with the last injection and this lasted him approximately one month.  However, now though he does not have the same intensity of pain in his lower back he is having trouble with pain in his feet, his right foot mostly, his left foot also.  He describes this as a pain in his leg and paresthesia like pains over the plantar aspect of the foot and around the ankles bilaterally.
>
> \* \* \* \* \* \* \* \* \*
>
> Because he has had improvement with the prior injection I think it is in line to still go with the findings of the MRI, especially in light of sacral nerves distribution being involved in his current complaint.  Therefore, we are going to go ahead and give him the second lumbar epidural steroid injection which covers approximately one month and seventeen days after the initial.

Tr. 135.

On March 11, 2000, Dr. Cummings completed a Physical Assessment form.  Tr. 161-162. Dr. Cummings opined Farris could sit 6 hours in an 8-hour workday but not continuously, stand 4

6

hours in an 8-hour workday but not continuously, and walk 4 hours in an 8-hour workday but not continuously.  Tr. 162.  Dr. Cummings also opined Farris could lift 10 pounds frequently and up to 20 pounds occasionally.  *Id.*

On April 20, 2000, Dr. Robinson, an orthopedist, evaluated Farris at Dr. Cummings' request.  Tr. 151.  Farris reported he continued to have pain in his lower back as well as intermittent pain radiating down his lower extremities.  *Id.*  Farris also complained of numbness and tingling in both of his feet intermittently.  The physical examination revealed (1) loss of normal lordosis; (2)  <u>significant paraspinous spasm and tenderness</u>; (3)  <u>motor strength of his lower extremities revealed a 5/5 strength in all groups</u>; (4) his <u>deep tendon reflexes bilaterally in both the knees and ankles were absent</u>; (5) <u>light touch sensation was intact</u>; (6) dorsalis pedis and posterior tibialis pulses were 2+; and (7) <u>he had a positive straight-leg raise on the right at 45 degrees and positive on the left at 50 degrees</u>.  *Id.* (emphasis added).  A review of the MRI showed a "broad centrally based L5-S1 herniated disk with some neural foraminal encroachment.  Dr. Robinson diagnosed Farris with low back pain, L5-S1 herniated disk.  Dr. Robinson opined Farris would have to continue with therapy and nonoperative modalities but referred him to Dr. Crawford at University Hospital for possible surgical consideration.  *Id.*

On May 19, 2000, Dr. Mark K. Crawford, Assistant Professor of Orthopedics and Chief of the Division of Spine Surgery, evaluated Farris at Dr. Robinson's request.  Tr. 156.  At that time, Farris was complaining of pain in his low back that radiated to his left leg.  Farris reported "the back pain had improved, but the left leg pain had not."  *Id.*  Dr. Crawford noted Farris had "<u>motor strength 5/5 throughout</u>, reflex [was] decreased at the left ankle when compared to the right ankle and he [could] toe walk and heal (sic) walk without difficulty."  *Id.*  Dr. Crawford's

7

impression was a herniated disc versus peripheral neuropathy. Dr. Crawford ordered an EMG and nerve conduction studies to determine "how much his peripheral neuropathy may be contributing to this neurogenic pain." *Id.*

On June 6, 2000, Farris returned to see Dr. Robinson. Tr. 150. Dr. Robinson reviewed the nerve conduction studies and noted <u>evidence of peripheral neuropathy consistent with diabetes</u>. Dr. Robinson diagnosed Farris with <u>L4-5 herniated disk and diabetic neuropathy</u>. At Dr. Crawford's recommendation, Dr. Robinson ordered an MRI.

On June 10, 2000, Farris had an MRI. Tr. 129. The MRI results are as follows:

COMPARISON EXAMINATION AND/OR REPORTS: Lumbosacral spine series of October 26, 1999 that demonstrated a disk protrusion at L5-S1.

MR FINDINGS: The sagittal images demonstrate preservation of the lumbar lordosis. There is decreased signal intensity on the sagittal T2 weighted images to intervertebral disks L5-S1 and, to a lesser degree, L4-5, L2-3, and T12-L1, all consistent with <u>disk degenerative disease</u> (disk desiccation). In addition, there is decreased disk height of T12-L1 and L1-2, also consistent with disk degenerative disease.
There is a benign-appearing hemangioma again noted in the vertebral body of L3.
There is homogeneous signal intensity to the bone marrow of the vertebral bodies.
There is a <u>small disk bulge noted on the sagittal projections at L5-S1</u>.

The axial images demonstrate the following:
L3-4: Normal.
L4-5: There is a <u>mild broad-based disk bulge causing no significant mass effect upon the exiting nerve roots and very minimal effacement of the anterior thecal sac.</u>
L5-S1: There is a <u>broad-based disk bulge with very mild effacement of anterior thecal sac and minimal effacement of the exiting nerve roots</u>.

IMPRESSION: Disk bulge at L5-S1, not significantly changed from previous study.

Tr. 129-130 (emphasis added).

On June 16, 2000, Farris returned to see Dr. Robinson. Tr. 149. Dr. Robinson noted that Farris' nerve conduction studies and EMG's demonstrated Farris suffered from underlying neuropathy. The MRI indicated L4-5 and L5-S1 herniated disk and a <u>very mild</u> canal stenosis and

minimal neuroforaminal stenosis.  Dr. Robinson referred Farris back to Dr. Crawford in order to have Dr. Crawford determine whether Farris could return to work as a heavy equipment operator or whether Farris should have some type of work modification.

On July 21, 2000, Farris returned to see Dr. Crawford.  Tr. 154.  Dr. Crawford reviewed Farris' recent MRI.  Tr. 154.  Dr Crawford noted the MRI "showed that the generative disc at L5-S1 with a slight left-sided bulge, slightly improved from before." *Id.* (emphasis added).  Dr. Crawford opined Farris "was not a good candidate for operative intervention as this will not significantly improve his symptomatology." *Id.*  Dr. Crawford indicated he would see Farris on a p.r.n. (as needed) basis and advised him to follow-up with Dr. Robinson in Silver City.  *Id.*

On December 7, 2001, Farris went for his follow-up visit with Dr. Cummings. Tr. 241-244.  Farris requested Dr. Cummings complete a disability form.  Dr. Cummings evaluated Farris and completed a Physical Ability Assessment form.  Dr. Cummings noted Farris had paravertebral muscle spasms and tenderness at the L5-S1 area.  Tr. 239.  Farris' lateral bend extension and rotation "were very mildly decreased throughout." *Id.* (emphasis added).  Significantly, Dr. Cummings found Farris' "radicular symptoms into the right leg [had] pretty much resolved." *Id.* (emphasis added).  Dr. Cummings did not find any deep tendon reflex abnormalities.  However, Dr. Cummings opined Farris would never be able to work heavy equipment again and could not do any sedentary jobs "now."  Tr. 242.  In support of his opinion, Dr. Cummings stated, "At this point and I suspect into the foreseeable future he will be disabled from any kind of work since his recurrent back pain is unpredictable with its exacerbations and he cannot sit, stand, walk or perform pretty much any tasks for a prolonged period of time that would be required of a

9

sedentary desk job and he certainly can't be lifting or stooping over or kneeling or doing those sorts of activities." Tr. 239.

On May 21, 2002, Keith Stanley, OTR (registered occupational therapist), administered a "Physical Work Performance Evaluation" at Dr. Cummings' request. Tr. 6-16.  Although the evaluation was not before the ALJ, it was before the Appeals Council.  Tr. 6.  Therefore, the Court must consider it when evaluating the Commissioner's decision for substantial evidence. *See, O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)(new evidence becomes part of the administrative record to be considered by the Court when evaluating the Commissioner's decision for substantial evidence).

On June 10, 2002, Mr. Stanley provided Dr. Cummings with a  Physical Work Performance Evaluation Summary.  Tr. 7.  Mr. Stanley reported the following:

> **Overall Level of Work**:
> Based on the information summarized in the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, it is difficult to predict if the client is capable of performing physical work at the **Sedentary level**, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles.  Based on this evaluation, it is difficult to predict if the client is capable of sustaining the sedentary level of work for an 8-hour day.
>
> **Overall Level of Client Participation:**
> Throughout the evaluation, participation was determined by comparing the client's willingness to exert a maximal effort to the evaluator's observations of client effort. Based on the Dynamic Strength, Position Tolerance, and Mobility sections of the evaluation, the client:
>
> Participated fully in 17 out of 17 tasks.
> Self-limiting behavior was evident in 11 out of 17 tasks in this evaluation.
>
> Self-limiting participation during the evaluation means that the client stopped the task before the specific physical signs of a safe maximal effort were observed.  The values reported for the 11 tasks in which the client self-limited represents, therefore, what the client was willing to do rather than a safe maximum effort.  The values for the remaining tasks represents the clients maximum physical efforts.

> Self-limiting participation may be due to one, or any combination, of several factors. Some common factors contributing to self-limiting participation are: pain, fear of pain, fear of injury/reinjury, depression, anxiety, lack of familiarity with a safe physical maximum, and lack of motivation to perform maximally secondary to perceived financial gain.

Tr. 7. Mr. Stanley reported that based on the evaluation, the factors underlying Farris' limitations appeared to be (1) progression of pain in the low back and (2) decreased motivation. Tr. 8. Mr. Stanley opined that it was difficult to predict or recommend a program for Farris because of the inconsistencies noted in the evaluation. Tr. 9. Nonetheless, Mr. Stanley recommended work conditioning and work stimulation to help improve the limitations listed. *Id.* According to Mr. Stanley,

> Farris demonstrated several inconsistencies with testing. The first came during the initial lifting of the dynamic strength portion. The client was asked to lift a box from the floor to waist level. At this time, he lowered himself to the floor on one knee and lifted the 8 lb box with one arm, placed it to his side and reached with (L) arm to a nearby table to (A) with standing. When client was instructed on the appropriate way to lift the box, he stated that he could not bend that way. He was then instructed to bend with the knees with very little lumbar flexion and he stated that he could not bend that way. He was then questioned how he could get his shoes on if that was the case and he proceeded to prop his foot up on a chair and reach and tie shoes, demonstrating more lumbar/hip flexion than necessary to have lifted the box. In performing the waist to eye level lift he had difficulty controlling the box, however at no time during any of the lifting portions did Mr. Farris demonstrate any signs of near maximal efforts. His primary limiting factors were his reports of pain which at its highest was reported at 6/10. He never actually refused to perform any portion of the test, he would just state that he could not perform that portion of the evaluation.

Tr. 11. In another section, Mr. Stanley noted:

> Primary limiting factors in this section for Mr. Farris was progression of pain symptoms. Client is a very pleasant gentleman again attempted every section but did demonstrate self-limiting behaviors on five out of the seven tasks attempted. Pain was reported highest at a 4-5/10. Client stated during the sitting portion if that was the only chair available. Several times during different portions he would complain that people just don't work in these positions and that he did not know why I was making him do this. After the squatting test, which he was unable to complete, he made a comment that, "**I know that the insurance companies are trying to get me to bend that way, but I will not do that.**" I then asked, then why are you doing this, and his comment was that they were making

>him. He then asked me why I was doing this, and I stated because I had the referral.
>Again, at no time was Mr. Farris confrontational or inappropriate.

Tr. 12 (emphasis in original). As the medical evidence indicates, Farris does not have the "significant limitation of motion in the spine" or "the significant motor loss with muscle weakness and sensory and reflex loss" required by Listing 1.05. Accordingly, the Court finds that the ALJ's determination that Farris does not meet or equal Listing 1.05C is supported by substantial evidence.

**(B)  Medical Expert's Testimony**

Farris next argues that the ALJ "goes to great length perceiving a difference of opinion between Doctors Robinson and Cummings." Pl.'s Mem. in Supp. of Mot. to Reverse and Remand at 5. Farris also contends the ALJ failed to set forth "any good cause" for not giving substantial weight to his treating physician's opinion. *Id.* at 9.

A treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments. *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). However, a treating physician's opinion that a claimant is disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Id.* The regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). When an ALJ decides to disregard a medical report by a claimant's physician, he

must set forth specific, legitimate reasons for his decision. *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996). Additionally, the opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved. See 20 C.F.R. § 404.1527(d)(5).

>In her decision, the ALJ stated:
>
>The claimant commenced visiting a family practitioner, Dr. Cummings, for his diabetes and chronic back pain. On September 15, 2000 that physician completed an RFC form, recommending restrictions on the claimant's activities. He recommended that the claimant could sit for six hours out of an eight hour workday, but not continuously, and that he could stand and walk for four hours each throughout the workday, but not continuously. He stated that the claimant could lift 20 pounds occasionally throughout the day, and 10 pounds more frequently. His opinion at that time supports a finding that the claimant could perform the demands of light work, with sitting, standing and walking for two hours at a time, and the capacity to sit, stand and walk for six hours each out of an eight hour workday, with the customary rest breaks and a meal break. Those capacities are the requirements for light work. However, Dr. Cummings later wrote in December 2001 that he was unable currently to perform the sitting required for sedentary work, and he states that he suspected that the claimant would not be able to sit, stand or walk for periods sufficient to perform any kind of work, because of unpredictable exacerbations of pain.
>
>It is interesting to note that Dr. Cummings, who is not qualified for a specialty in the fields of orthopedics or chronic pain, would restrict the claimant more significantly than would Dr. Robinson, who is a specialist in the field of orthopedics. I accord Dr. Robinson's opinion as to the effects and severity of the claimant's orthopedic condition greater weight. I note additionally that Dr. Cummings inconsistently observed that the claimant showed no obvious distress when sitting, on the very same day he recommended that he would not be able to perform any sedentary work. He does not indicate why he feels the claimant's back condition prevents sedentary work of any kind. Dr. Cummings' opinion is not supported by the MRI evidence and the opinion of the claimant's orthopedist, which indicate that his back condition is relatively mild. He does not explain why the claimant's back causes more restriction on his activities than it did in September 2000, and he does not state that the claimant's back condition has worsened. He appears to base his opinion on the claimant's reports of symptoms and functional difficulties, which I do not find fully credible. Dr. Cummings' statement that he "suspects" that the claimant will not be able to work at any job in the future is equivocal and speculative in nature. For all the foregoing reasons, I find that Dr. Cummings' more recent opinion that the claimant is unable to perform sedentary work, or that he is or will be unable to perform all work, is not helpful to me in my assessment of the claimant's work capacities under the standards of the Social Security Act, and it is therefore not accorded significant weight herein.

Tr. 27-28.

In this case, the ALJ properly gave more weight to Dr. Robinson, the orthopedist, than to Dr. Cummings, the family practitioner. As a specialist in the field of orthopedics, Dr. Robinson's opinion as to Farris' orthopaedic impairments was entitled to more weight. Additionally, the ALJ found Dr. Cummings failed to explain or support his conclusion that Farris was disabled and his opinion was not supported by the objective medical evidence (the MRI). Tr. 27. Substantial evidence supports these findings. The ALJ also found Dr. Cummings' opinion of disability was not supported by the opinion of Dr. Robinson, Farris' orthopedist. However, Dr. Robinson referred Farris back to Dr. Crawford in order to haveCed Dr. Crawford determine whether Farris could return to work as a heavy equipment operator or whether Farris should have some type of work modification. Tr. 149. When Farris returned to see Dr. Crawford, Dr. Crawford opined Farris was not a good candidate for operative intervention but did not offer any opinion as to Farris' ability to return to his past relevant work or any other work. Therefore, Drs. Robinson and Crawford offered no opinions as to whether Farris was disabled, whether he could perform his past relevant work, or whether he retained the RFC for any other work.

## B. Consultative Examination

Farris contends the ALJ should have "obtained the opinion of a consulting physician." Pl.'s Mem. in Supp. of Mot. to Reverse and Remand at 7. The ALJ has broad latitude in determining whether to order a consultative examination. *See Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990). In this case, a consultative examination would be necessary if the evidence as a whole, both medical and nonmedical, would not be sufficient to support a decision or to resolve conflicts in the medical evidence. *See* 20 C.F.R. § 404.1519a. Neither situation applies to this case. However, because Dr. Robinson, Farris'

treating physician and an orthopedist, and Dr. Crawford, also an orthopedist, gave no opinion as to Farris' ability to work, the ALJ should have contacted them pursuant to 20 C.F.R. § 404.1512(e).  Section 404.1512(e)(1) states in pertinent part, "We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not contain all the necessary information . . . ."  20 C.F.R. § 404.1512(e)(1).  In this case, the ALJ should have sought clarification from Drs. Robinson and Crawford and requested one or both doctors to complete a Medical Assessment of Ability to do Work-Related Activities (Physical) form.

Additionally, in arriving at her RFC determination, the ALJ found that Farris' "[n]onexertional factors [had] not significantly eroded his work capacity."  Tr. 26.  In support of this finding, the ALJ stated, "This conclusion is supported by the opinion of the medical consultant, and it is not inconsistent with the opinion of the claimant's orthopedist."  *Id.* However, as already noted, Dr. Robinson offered no opinion as to how Farris' back impairment affected his ability to work.

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.* The ALJ must

15

also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.* On remand, the ALJ should apply Social Security Ruling 96-8p, consult with Dr. Robinson and/or Dr. Crawford and have either one or both specialists complete a Medical Assessment of Ability to do Work-Related Activities (Physical) form. The ALJ may also order a consultative examination, if she determines it is necessary.

### C.  Credibility Determination

Farris contends the ALJ's credibility determination is conclusory and contrary to law. Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz,* 898 F.2d at 777. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence she relies on in evaluating claimant's credibility. *Id.* The ALJ may also consider her personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

In this case, the ALJ set forth the specific evidence she relied on in evaluating Farris' credibility. The ALJ found (1) Farris' diagnostic testing did not support pain to "the disabling degree alleged," (2) he had earlier testified that he no longer had radicular symptoms down his right leg, (3) his treating orthopedist did not diagnose radicular symptoms, and (4) he testified his orthopedist wanted to wait to do back surgery when, in fact, the orthopedist had opined back

surgery was not indicated.  Tr. 26.  Accordingly, the Court finds that the ALJ's credibility determination is supported by substantial evidence.

**D.  Conclusion**

The Court will remand for the limited purpose of having the ALJ consult with Drs. Robinson and Crawford concerning Farris' RFC and reconsider her RFC determination.  The ALJ may also order a consultative examination, if she determines it is necessary.  However, the Court expresses no opinion as to the extent of Farris' back impairment, or whether he is or is not disabled within the meaning of the Social Security Act.  The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**